# Case No. 13,117.

### SMITH v. TREAT.

[2 Ware (Dav. 266) 270;[1] 4 N. Y. Leg. Obs. 13; 14 Hunt, Mer. Mag. 69.]

### District Court, D. Maine. Nov. 4, 1845.

SEAMEN—JUSTIFICATION FOR DISCHARGE—ARREST IN FOREIGN PORT—WAGES.

1. The arrest and imprisonment of a seaman in a foreign port, and sending him home by the public authority as a prisoner charged with an indictable offense, does not necessarily constitute a bar to a claim for wages for the voyage. Such proceedings do not preclude the court from inquiring into the merits of the case, and making such a decree as the justice of the case requires.

[Cited in Tingle v. Tucker, Case No. 14,057.]

2. The master is not ordinarily justified in dissolving the contract with a seaman, and discharging him for a single fault, unless it is of a high and aggravated character.

[Cited in The Cornelia Amsden, Case No. 3,234.]

3. The causes for which a seaman may be discharged are ordinarily such as amount to a disqualification, and show him to be an unsafe or an unfit man to have on board the vessel.

This was a libel for wages [by William Smith against Hiram Treat]. The libellant shipped as a seaman, April 25, 1845, on board the brig Benjamin, at Frankfort, for a voyage to some port in the West Indies and back, for wages at the rate of $15 per month. The brig returned August 17th, and the libellant claimed wages for the whole time; the balance due being $42.50, one month's wages having been advanced to him at the time of shipping.

L. D'M. Sweat, for libellant.
A. Haines, for respondent.

WARE, District Judge. The libellant in this case went and returned in the brig, and it is not denied that full wages are due to the termination of the voyage, unless they were lost or forfeited by what took place at Point Petre, the port of discharge. The affair which is relied on as a forfeiture, or more properly as a bar to the claim for wages, took place on the 21st of May, while the crew were discharging the cargo. The captain being at that time on shore, the men, under the orders of the mate, were making up a raft of lumber to be floated ashore, when a difficulty arose between Tappan, the mate, and Hadley, one of the crew. While the mate was below making up his account of lumber discharged, he heard a noise on deck, and came up to put a stop to it. He found it was made by Hadley, who was on deck passing off lumber to make up the raft, Smith, the libellant, being at work with him. He ordered Hadley to stop his noise, or go below. Hadley, who had been

[1] [Reported by Edward H. Daveis, Esq.]

drinking pretty freely but not so as to render him incapable of work, replied that he would not go below for him, nor for any other man. Tappan rejoined, that if he continued his noise he would put him below; and Hadley, again replied, that neither he nor any one else could put him below. Tappan then called to the second mate, who was on the raft, to come on deck and assist in putting Hadley below, whose noise had then attracted the attention of persons near the vessel. Smith, who was at work with Hadley, and to whom nothing had been said, then interposed and said to the mate, "If you put one below, you must put all hands below." The difficulty, however, subsided without any act of violence, and the men returned to their work, and continued quiet for an hour, or an hour and a half, when Hadley again became noisy. It is not easy, from the varying accounts of the witnesses, to determine the precise facts which took place after this time, or the exact order in which those occurred, in which the accounts of all the witnesses agree. The noise appears to have commenced between Hadley and Smith, who were at work together; Tappan, the mate, interposed to stop it, and an affray took place. Tappan knocked down Hadley with his fist; Smith interposed and gave a blow to Tappan and they clenched. While they were clenched, Hadley got up, and some of the witnesses say that he stood by and looked on, without taking a part. But Harriman, the second mate, who at this time came on deck, says that both Smith and Hadley were upon the mate, and had got him down on a barrel; that as he was going to his relief, Hadley left Tappan and came towards him; that he avoided and passed him, and that he, Hadley, followed him as much as twenty-five feet towards the pump; that he then took a pump-brake, and that Hadley then struck him with his fist, and he then gave him a blow on his head with the pump-brake, which brought him partly down, and then another, that brought him to the deck; that he then went to Tappan, whom Smith had down and was beating. He told Smith to let Tappan alone, but he refused and told Harriman not to strike him. Harriman then gave him three blows with the pump-brake, before he brought him down, and then turned to Hadley, who had got up, and fallen over the deck into the water. He then went on to the raft and got Hadley out of the water, and when he came on deck Tappan and Smith were again clenched. At this moment, the captain came on board and put an end to the affray. The blows given to Hadley proved mortal, and he died the following night. Smith was arrested that night and confined in prison, and sent home in irons by order of the American consul. He was indicted, at the adjourned term of the circuit court, on a charge of stirring up the crew to resist the officers of the vessel, and was acquitted of the charge by the jury.

Such are the most material facts, as nearly

as I can recollect them from the testimony, which, though not in all respects quite contradictory, is not, in all its parts, exactly reconcilable. One month's wages, covering the whole period of his service previous to his arrest and imprisonment, had been paid in advance, and the libellant now claims wages to the termination of the voyage. For the respondent, it is contended that the misconduct of Smith, followed by his arrest and imprisonment, and his being sent home by the public authority in chains, as a criminal, is a conclusive bar to any claim for wages beyond what have been paid.

This court, I hold, is not excluded by any of the proceedings at Point Petre, from inquiring into the merits of the case, and making such a decree as, on the whole, right and justice may require. The libellant was tried and acquitted on the charge, and even if he had been convicted, this would not have been a bar to the present suit. The Mentor [Case No. 9,427]. His claim stands entirely unprejudiced by any of the proceedings at Point Petre, and his misconduct, admitting it in all the aggravation that is alleged, cannot operate properly as a forfeiture of the wages now claimed. The wages forfeited under the marine law are properly the wages previously earned, and not those which are or may be earned subsequently. Both justice and policy require this limitation of the forfeiture. If it extended to future earnings for the remainder of the voyage, it would take from the seaman all the ordinary and most influential motives for good conduct. He would never willingly and cheerfully perform his duties, if he knew beforehand that, however diligent and faithful he might be, he could receive no compensation for his services. But a seaman may, by misconduct, not only forfeit all wages antecedently earned, but his misconduct may be such as will authorize the master to dissolve the contract, and discharge him from the vessel. The principal question presented in this case is, whether the conduct of the seaman was such as would, by the principles of the maritime law, authorize the master to discharge him from the vessel. By the old sea laws, which are the records of the early customs and usages of the sea, the master is authorized to discharge a seaman for drunkenness, for quarreling and fighting with the other men, for theft, for going on shore without leave, and for disobedience. Jugemens d'Oleron, arts. 6, 13; Consulat de la Mer, 125; Laws of Wisbury (Cleirac's Ed.) 18; Laws of the Hanse Towns, 29, 45. Some of these laws are curiously minute and particular on this as well as other subjects. The Consulate of the Sea authorizes the master to dismiss a seaman for three causes; for theft, quarreling, and disobedience to the orders of the master, and subjoins by way of amendment, perjury as a fourth cause, but adds, that he shall not be discharged for the first, but only for the fifth offense. Generally speaking, the causes which justify the master in discharging a seaman before the termination of the voyage, and especially in a foreign port, are such as amount to a disqualification and show him to be unfit for the service he has engaged for, or unfit to be trusted in the vessel. They are—mutinous and rebellious conduct, persevered in, gross dishonesty, or embezzlement, or theft, or habitual drunkenness, or where the seaman is habitually a stirrer-up of quarrels, to the destruction of the order of the vessel and the discipline of the crew. Thorne v. White [Case No. 13,989]; Black v. The Louisiana [Id. 1,461]; Drysdale v. The Ranger [Id. 4,097]; Sprague v. Kain [Id. 13,250]; Orne v. Townsend [Id. 10,583]; The Lady Campbell, 2 Hagg. Adm. 5; The Vibilia, Id. 228.

Ordinarily, the law will not justify the master in dismissing a seaman for a single offense, unless it be of a very high and aggravated character, implying a deep degree of moral turpitude, or a dangerous and ungovernable temper or disposition. It looks on occasional offenses and outbreaks of passion, not so frequent as to become habits, with indulgence, and by maritime courts it is administered with lenity and a due regard to the character and habits of the subjects to whom it applies. They are a race of men proverbially enterprising and brave, exposed by the nature of their employment to great personal dangers and hardships, contending with the elements in their most violent and tempestuous agitations, and encountering these dangers and hardships with the most persevering courage. But with all this, they are of a temperament hasty and choleric, quick to take offense, and ready, on the excitement of the moment, to avenge any supposed wrong or indignity. The law looks on the fairer traits of their character with kindness, and as making some compensation for defects and faults, which are perhaps not unnaturally, or at least are very frequently, associated with those qualities which render them so valuable to their country in peace as well as in war. And when these show themselves occasionally and are not habitual, it will not visit them with severity, but imposes its penalties with a sparing hand. From considerations of this kind, the court will seldom punish a single offense with a forfeiture of all the wages antecedently earned, much less will it be held as a justification of a discharge of a seaman from the vessel. But still there are causes which will justify the master in dismissing a seaman and putting an end to the contract. Was this such a case? The conduct of the libellant, up to the time when this affray took place, had been, if not entirely unexceptionable, such as had not exposed him to any special censure. But on this occasion, though, in the judgment of the jury, the part which he took did not amount to the offense charged in the indictment, it was highly censurable and approximating to mutiny. Hadley, under the excitement of liquor, had been turbulent and noisy, so much so as to attract

the attention of persons in the vicinity of the vessel. Both the mates, the master being on shore, had before by gentle means attempted, and for the time succeeded in quieting him. Tappan told him if he continued his noise he should put him below. This was certainly no harsh punishment, but a very proper act of discipline unless quiet and order were restored. The answer of Hadley was insolent, but no notice was taken of that, nor was there any attempt, by the mate, to put the threat into execution. It is apparent that he was satisfied with putting a stop to the noise. But Smith immediately interposed, and in a tone of defiance told the mate if he put one man below, he must put all below. Such language and conduct, under the circumstances of the case, if not amounting to the technical offense of stirring up the crew to resist the orders of the officers, was clearly of a mutinous tendency, and subversive of the discipline of the ship's company. Hadley became quiet and the difficulty subsided. But he soon again resumed his noise, and the disorder at this time arose from a difficulty between him and Smith. The mate again interposed to stop the noise. It is not easy, from the imperfect and somewhat conflicting account given by the witnesses, to determine how the quarrel now commenced. What is certain is that Smith interposed on the part of Hadley, a scuffle ensued, and blows were given on both sides. Smith and Hadley both being against the mate, they got him down and held him down until he was partially relieved by the second mate's coming to his aid. Even after Hadley was disabled by the blow, which unfortunately put an end to his life, Smith fiercely continued his assault on Tappan, the mate, nor did he relinquish his grasp, though Harriman repeatedly struck him with a heavy pump-brake, but persevered until the master came on board and put an end to the fight. It is in proof, that Tappan was severely beaten and bruised by Smith, or by Smith and Hadley together. Through the whole of the affair, until it came to blows, the conduct of the officers was moderate and forbearing. There was nothing particularly irritating, and certainly nothing that excused the intemperate violence and mutinous conduct of Smith. From the beginning to the end he was a volunteer in the quarrel, and it is difficult to account for the part he acted but by supposing it to flow from a radically quarrelsome disposition. It was commenced without cause and continued with a persevering malignity not often witnessed; and in fact the melancholy tragedy in which the affair ended may be distinctly traced to the insubordination and violence of Smith as its first cause.

Whether, but for the tragic end of this affair, the master would have thought it necessary, or would have been justified in discharging the libellant and putting an end to the contract, is a question on which perhaps one might pause. Smith had, on no other oc-

casion, exhibited a temper of dangerous insubordination, and it might have been safe for the master to have retained him on board, and to have left this matter to be settled at the termination of the voyage. As it was, certainly it was the duty of the master to call on the civil authority of the place, and put the affair in a train of judicial examination. The result of that inquiry was, that Smith was sent home as a prisoner to answer for his conduct to the laws of his country. And, from the facts developed on the trial here, it appears to me that the civil authorities were perfectly justified in this course. The consequence was that the libellant was disabled from performing the service for which he was engaged, and from the whole facts in proof in the case, he may justly be considered as having disabled himself by his own voluntary act. On the principles of natural justice and universal law, he cannot claim a compensation for services which he has by his own fault disabled himself from performing. The libel must therefore be dismissed.

NOTE. As a part of the history of this transaction, it may be added that Harriman, the second mate, was indicted, in the circuit court, for an assault with a dangerous weapon, which resulted in the death of Hadley. Under the statutes of the United States, manslaughter would not lie, since the death occurred on shore, whither Hadley was removed after the fatal blow, and without the jurisdiction of the United States. On a verdict of guilty, the circuit court, in consideration of the circumstances of the case, sentenced Harriman to a brief imprisonment—the penalty for the offense laid being in fact, under the statute, the same as that for manslaughter.